**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHELLE ROBERTS, individually, on behalf of herself and all others similarly situated,<br><br>       *Plaintiff*,<br><br>    v.<br><br><br>B-TWO OPERATIONS LTD. d/b/a SPINBLITZ,<br><br>       *Defendant*. | Case No.  3:25-cv-1689 (ECC/ML) |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Michelle Roberts ("Plaintiff"), individually and on behalf of all others similarly situated, hereby alleges the following against Defendant B-Two Operations Ltd. d/b/a SpinBlitz ("Defendant" or "SpinBlitz"), based upon, *inter alia*, the investigation made by her counsel, and based upon information and belief, except as to those allegations and experiences specifically pertaining to Plaintiff which are based upon her personal knowledge.

**NATURE OF THE CASE**

1.  This case arises out of Defendant's operation of an illegal online gambling platform that it markets as a "free" "social casino," but in reality, is an unlicensed casino prohibited under New York law.

2.  Defendant owns and operates SpinBlitz (https://www.spinblitz.com/), one of the most popular and profitable casino and sweepstakes gaming websites on the planet.

3.  Through SpinBlitz, users can access and play thousands of popular casino games, including, *inter alia*, jackpots, slots, roulette, baccarat, and Megaways titles (the "Chance

Games"). Some of these games are even hosted by live dealers in real-time, further mimicking the experience of a physical casino.

4.     The Chance Games offered on SpinBlitz are unequivocally games of chance. Their outcomes are determined primarily, if not exclusively, by randomization—rendering them indistinguishable from the games found in traditional, brick-and-mortar casinos.

5.     To evade regulatory scrutiny and mislead consumers, SpinBlitz markets itself as a "social casino." This designation is purely cosmetic, designed to create the false impression that the platform provides benign, entertainment-only gameplay, when in reality it facilitates and profits from illegal gambling.

6.     In practice, SpinBlitz operates in a manner virtually indistinguishable from a traditional online casino. Players can purchase in-game currency, use that currency to wager on games of chance, and subsequently redeem their winnings for cash or gift cards. SpinBlitz's rapid growth and popularity are directly attributable to its realistic casino-like experience, which includes authentic gameplay, partnerships with well-known gaming studios, robust bonus programs, and fast, reliable payout systems.

7.     SpinBlitz derives its revenue primarily through the sale of in-game currency—specifically, virtual coins—which function as a de facto substitute for real money and are necessary for users to participate in games on the platform.

8.     The platform features two forms of virtual currency: "Gold Coins" and "Sweepstakes Coins." While Gold Coins are offered with promotional bonuses such as sign-up rewards and daily refills, ensuring continuous user engagement, they are marketed as having no real-world monetary value.

9.     However, SpinBlitz conceals the true nature of its business model. The purchase of

Gold Coins is typically "bundled" with Sweepstakes Coins—another currency that **does** carry real-world value.[1]

10.    Players use Sweepstakes Coins to enter sweepstakes-style games, which offer the chance to win cash or gift cards.

11.    After meeting a minimal 1x playthrough requirement and collecting at least 50 Sweepstakes Coins, players can redeem them for cash. Alternatively, with a minimum of 10 Sweepstakes Coins, players can redeem for gift cards.[2] In effect, players are wagering a valuable currency (Sweepstakes Coins) on games of chance in order to obtain prizes of greater value—a textbook definition of gambling.

12.    The structure and pricing of SpinBlitz's virtual currency offerings make clear that the platform's true aim is to facilitate and profit from the sale of Sweepstakes Coins. Despite nominal distinctions between the two types of currency, the underlying games are purely games of chance; they require little to no skill to determine the outcome.

13.    Virtual gambling is highly addictive and strictly regulated in New York. By law, these games can only be offered by licensed operators in licensed, physical locations. New York prohibits gambling that involves risking something of value, including virtual coins that can be redeemed for cash or prizes. Defendant's operations flout these legal requirements by providing unlicensed gambling services to New York residents via its Chance Games.

14.    Plaintiff, individually and on behalf of all others similarly situated, seeks all

---

[1] According to player reviews, SpinBlitz's most enticing feature is its significant bonus bundle. https://www.trustpilot.com/review/spinblitz.com (last accessed November 3, 2025). Upon registration, new users generally receive 7,500 Gold Coins and 2.5 Sweepstakes Coins.

[2] https://deadspin.com/sweepstakes-casinos/reviews/spin-blitz/redemptions/ (last accessed November 3, 2025) provides an in-depth guide to the currency and redemption systems of SpinBlitz.

available remedies at law and equity, including damages, restitution, declaratory, and injunctive relief.

## PARTIES

15.     At all times material hereto, Plaintiff Michelle Roberts has been a resident and citizen of Windsor, New York, and is domiciled in Broome County, New York.

16.     Defendant is a foreign company existing and organized under the laws of Isle of Man, with its headquarters and principal place of business in Second Floor, 18-20 North Quay, Douglas, Isle of Man, IM1 4LE. Defendant is a subsidiary of B2Spin Limited, based and headquartered in Gibraltar. Therefore, Defendant is considered diverse from Plaintiff for purposes of 28 U.S.C. § 1332(d)(2). Defendant owns and operates a gambling website (available at https://www.spinblitz.com/), under the brand "SpinBlitz." Defendant conducts business within the venue of this District and throughout New York generally, which website and operations are not permitted and are illegal under New York law.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Class is a citizen of a different state than Defendant, namely Plaintiff, a citizen of the state of New York (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply to this action.

18.     This Court has personal jurisdiction over Defendant because, as further described below, Defendant continuously and systematically conducts business and is authorized to conduct business here. Defendant sells or sold its products to consumers in New York, including to Plaintiff.

19.     Moreover, Defendant actively disseminates targeted advertisements within the state

4

with the intent of promoting and selling its products and services to consumers there. As such, Defendant does business with sufficient minimum contacts in New York, and/or otherwise intentionally avails itself of the New York market.

20.    Defendant has purposefully directed its activities toward this District.

21.    Defendant has purposefully availed itself of the privileges of conducting activities in this District.

22.    Plaintiff's claim arises out and relates to Defendant's forum-related activities.

23.    The exercise of jurisdiction over Defendant is reasonable.

24.    Upon information and belief, Defendant localized or still localizes its game for each market where it is distributed, including the United States. This localization includes changes to the language and currency presented in SpinBlitz.

25.    Upon information and belief, Defendant has sold a substantial amount worth of virtual items to thousands of New York residents, most of which are repeat purchases by the same customers, by contracting with the customers to sell virtual coins and other goods in exchange for legal tender.

26.    SpinBlitz facilitated ongoing economic activity between thousands of New York players and Defendant.

27.    Upon information and belief, Defendant directly controls whether consumers in New York can complete purchases from SpinBlitz.

28.    Upon information and belief, Defendant has the capability to determine where its customers are from, including whether purchases are being made from New York.

29.    Upon information and belief, Defendant has the capability to prevent New York residents from completing purchases or placing wagers in SpinBlitz, but has chosen to accept those

purchases and wagers from New York residents. For example, other gambling websites prevent transactions from residents of states where gambling is unlawful.

30.     Upon information and belief, until recently, Defendant did not take steps to restrict New York residents' access to SpinBlitz or to restrict the ability of New York residents to make purchases from SpinBlitz.

31.     Upon information and belief, these advertisements for SpinBlitz were designed and directed to attract consumers in the United States, including this District, to play SpinBlitz.

32.     Upon information and belief, Defendant has the capability of targeting its SpinBlitz advertisements by geography and the capability of excluding residents of New York from the reach of Defendant's advertisements for SpinBlitz.

33.     Upon information and belief, Defendant partners with entities to serve targeted online ads at users of other companies' websites, games and online services. Upon information and belief, these ads are targeted at players that Defendant identifies as potentially interested in SpinBlitz, including residents of New York. Upon information and belief, Defendant utilizes unique device identifiers and Google Advertising ID and IP addresses in connection with these targeted ads. This information allows Defendant to identify the geographic location of its ad targets, including whether they are in New York.

34.     Upon information and belief, until recently, Defendant did not take steps to restrict its advertisements for SpinBlitz from reaching residents of New York.

35.     Venue is proper in this District under the provision of 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District. All of Plaintiff's activities and losses in SpinBlitz occurred in this District.

36.     Plaintiff alleges, upon information and belief, that Defendant did or still conducts

professional and commercial activities in New York on a substantial, continuous, and systematic basis and therefore Defendant is subject to the general jurisdiction of the courts of this state.

37.     Plaintiff further alleges, upon information and belief, that the claims asserted in this complaint arise out of or are related to each of the Defendant's professional and commercial activities within New York, and therefore the Defendant is subject to the specific jurisdiction of the courts of this state.

38.     The amount in controversy exceeds the jurisdictional minimum of this Court.

## **FACTUAL BACKGROUND AND COMMON ALLEGATIONS**

### I.     *The Problem of Online Gambling*

39.     Gambling addiction in the United States has escalated into a significant public health crisis, fueled by the rapid expansion of online casinos and sports betting platforms, including so called "social casinos."

40.     Since the Supreme Courts 2018 decision to legalize sports betting, the number of states with legal sportsbooks has surged from 1 to 38, with total sports wagers increasing from $4.9 billion in 2017 to $121.1 billion in 2023.[3] This proliferation has been accompanied by a dramatic rise in gambling addiction cases.[4]

41.     Approximately 2.5 million adults in the U.S. suffer from severe gambling problems, while an additional five to eight million experiencing significant issues.[5] Alarmingly, individuals

---

[3]   https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting?utm_source=chatgpt.com (last accessed November 3, 2025).

[4] *See id*.

[5]   https://news.harvard.edu/gazette/story/2025/01/online-gambling-is-on-the-rise-panel-says-we-need-to-act-now/#:~:text=The%20National%20Council%20on%20Problem%20Gambling%20estimates%20that%20about%202.5,of%20callers%20is%20skewing%20younger. (last accessed November 3, 2025).

with gambling disorders are 15 times more likely to commit suicide than the general population.[6]

42.    Between 2018 and 2021, the Nation Council on Problem Gambling (NCPG) estimated that the risk of gambling addiction grew by 30%. NCPG has also seen significant increases in calls, texts and chats to the National Problem Gambling Helpline—roughly a 45% increase in calls between 2021 and 2022.[7]

43.    Further, internet searches for help with gambling addiction, such as "am I addicted to gambling", have cumulatively increased 23% nationally since *Murphy v. NCAA* through June 2024. This corresponds with approximately 6.5 to 7.3 million searches for gambling addiction help-seeking nationally, with 180,000 monthly searches at its peak.[8]

44.    The surge in gambling addiction is particularly pronounced among young men, with 10% exhibiting behaviors indicative of gambling addiction, compared to 3% of the general population.[9] Online platforms, including social casinos, have been identified as significant contributors to this trend. These platforms often employ addictive design features, such as near-miss outcomes, fake limited-time sales, and variable reinforcement, to keep users engaged.

45.    The addiction and fallout related thereto is not limited to gamblers. It has a ripple effect that negatively impacts spouses, partners, children, and employers. Moreover, despite the growing prevalence of gambling addiction, funding for treatment remains insufficient.

---

[6] https://www.who.int/news-room/fact-sheets/detail/gambling#:~:text=A%20Swedish%20study%20estimated%20that,the%20general%20population%20(4) (last accessed November 3, 2025).

[7] https://www.ncpgambling.org/news/ncpg-statement-on-the-betting-on-our-future-act/    (last accessed November 3, 2025).

[8]    https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting?utm_source=chatgpt.com (last accessed November 3, 2025).

[9] https://apnews.com/article/sports-betting-compulsive-gambling-addiction-d4d0b7a8465e5be0b451b115cab0fb15 (last accessed November 3, 2025).

## II.    *New York law prohibits Sweepstakes Casinos and Online Gambling*

46.    New York generally prohibits all commercial gambling, with limited exceptions, none of which apply here. *See* N.Y. Const. art. I, § 9; Gen. Oblig. L. § 5-401. This prohibition reflects the State's strong public policy against online gambling. *See Ramesar v. State*, 224 A.D.2d 757, 759, 636 N.Y.S.2d 950 (1996) (noting New York's "[p]ublic policy continues to disfavor gambling.").

47.    In New York, gambling occurs when a person "stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome." N.Y. Penal Law § 225.00(2).[10] Both physical casinos in New York and virtual casinos that are made available to New Yorkers online are subject to these laws. *See, e.g.*, *People v. World Interactive Gaming Corp.*, 714 N.Y.S.2d 844, 846 (Sup. Ct. N.Y. Cty. 1999).

48.    New York's statutory definition of "something of value" is expansive and includes:

any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise directly or indirectly contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge.

N.Y. Penal Law § 225.00(6).

49.    Defendant willfully and blatantly disregards New York's clear prohibition on gambling. As discussed further below, the SpinBlitz platform allows users to purchase and wager "Sweepstakes Coins"—digital currency that, like chips in a brick-and-mortar- casino, can be redeemed for real money—on games of chances, including slot machines, jackpot games, and

---

[10] The Penal Law imposes no criminal liability on individual bettors, focusing instead on bookmakers and other operations, like Defendant, that advance or profit from illegal gambling activity. *See, e.g.*, N.Y. Penal Law § 225.10.

other casino-style offerings.

50.   Indeed, a user that wagers Sweepstakes Coins on the spin of a virtual slot machine is "stak[ing] or risk[ing] something of value"—Sweepstakes Coins—"upon the outcome of … a future contingent event not under his control"—the results of the slot machine spin—"upon an agreement or understanding that he will receive something of value in the event of a certain outcome"—namely, more Sweepstakes Coins, which can be redeemed for money or prizes.

51.   Critically, virtual coins, such as Sweepstakes Coins, which are both sold to players and exchangeable for money or prizes, plainly constitute "something of value." This is true regardless of whether any particular coin was purchased directly or obtained as part of a bundle or promotion. Thus, SpinBlitz's virtual casino games fall squarely within the ambit of New York's anti-gambling laws.

52.   The New York Attorney General's Office recently confirmed that "[o]nline sweepstakes casinos are illegal, dangerous, and can seriously ruin people's finances."[11] According to the Attorney General, "New York law prohibits online platforms from offering gambling that involves risking something of value, including virtual coins that can be redeemed for cash or prizes."[12]

53.   Attorney General James emphasized that sweepstakes casinos "are not subject to audits and other regulatory oversight by the state to ensure that games are not rigged, putting New Yorkers at risk."[13]

---

[11]    *See*    https://ag.ny.gov/press-release/2025/attorney-general-james-stops-illegal-online-sweepstakes-casinos (last accessed November 3, 2025).

[12] *Id*.

[13] *Id*.

54.     Likewise, the Chairman of the New York State Gaming Commission, Brian O'Dwyer, explained that these "so-called 'sweepstakes' games are unscrupulous, unsecure, and unlawful."[14]

55.     New York State Senator Joseph Addabbo, Jr. described sweepstakes casinos as "prohibited, unregulated, and unenforceable gambling entities" that "not only put individuals at risk of fraud and financial exploitation, but … also create dangerous pathways for gambling addiction, especially among minors."[15]

56.     On June 6, 2025, Attorney General James announced that her office has stopped online sweepstakes casinos operating in New York. Upon information and belief, SpinBlitz was shut down in New York as a result of a cease-and-desist letter sent from the Attorney General's office.[16]

### III.     *Defendant Uses Free "Social Gaming" as a Pretext for Real, Online Gambling.*

57.     SpinBlitz advertises itself as a "social casino" website to avoid gambling regulations and reassure potential players that it offers casino-style games purely for entertainment, without real-money stakes. SpinBlitz claims it is a "free" play casino. SpinBlitz prominently represents that "**THIS WEBSITE AND THE SERVICES PROVIDED HEREIN DO NOT OFFER "REAL MONEY GAMBLING." NO ACTUAL MONEY IS REQUIRED TO PLAY, AND THE SERVICE IS INTENDED FOR ENTERTAINMENT PURPOSES ONLY.**" (emphasis in original). However, this representation is false and misleading. In practice, SpinBlitz

---

[14] *Id.*

[15] *Id.*

[16] https://ag.ny.gov/press-release/2025/attorney-general-james-stops-illegal-online-sweepstakes-casinos (last visited November 3, 2025)

enables users to engage in real-money gambling through its system of Sweepstakes Coins, deceiving consumers into believing they are participating in harmless gameplay when, in fact, they are wagering something of value for the chance to win tangible prizes.

58.    The SpinBlitz platform offers a wide variety of casino-style games, including digital slot machines, blackjack, poker, roulette, and lottery-style wheels. Through these games, Defendant provides users the opportunity to win sweepstakes prizes by accumulating and redeeming so-called Sweepstakes Coins. Here is an example of one of their slot games and how the gameplay is displayed:



59.    Users can access SpinBlitz via its website throughout the United States, including in New York.

60.    Upon accessing the platform, users are presented with an array of casino-style games, prominently including slots, roulette, poker, and blackjack.

61.    Once a user selects a game, they are prompted to wager either Gold Coins or Sweepstakes Coins to play. Here is an example of how SpinBlitz prompts its users to select either Gold Coins or Sweepstakes Coins to wager before starting a game:



62.    In the illustration above, SpinBlitz makes it easy to switch between wagering Gold Coins and Sweepstakes Coins. This simple mechanism is designed to make it as convenient as possible for players to transition to gambling with real-world stakes. Players who start out playing for fun can quickly and effortlessly shift to risking actual money without fully appreciating the financial consequences.

63.    After selecting their game, players then place their wagers by selecting the amount of Gold Coins or Sweepstakes Coins they wish to stake per round or spin. Depending on the outcome of the game, players may win additional coins, functioning in the same manner as traditional gambling wagers.



64.    In addition to automated games, SpinBlitz also offers a "live casino" feature, where users play games like blackjack and roulette with live human dealers who are visible through webcam streams, closely mimicking the experience of a physical casino.



65.    In sum, the games of chance offered by SpinBlitz—including slots, blackjack, and roulette—constitute gambling. These games are functionally identical to those offered in traditional casinos such as those in Las Vegas.

66.     When consumers first visit the SpinBlitz platform, they are provided with a quantity of free Gold Coins. Additional Gold Coins may be obtained through promotional giveaways and other marketing efforts.

67.     Consumers also use Sweepstakes Coins to play games on the platform. Unlike Gold Coins, Sweepstakes Coins are redeemable for cash and gift cards. Upon information and belief, each Sweepstakes Coin is equal in value to $1 USD in prizes, rendering Sweepstakes Coins a proxy for real money.

68.     Plaintiff and, upon information and belief, the vast majority of players on the SpinBlitz platform regularly buy additional coin bundles when they run out of Sweepstakes Coins even when they already possess unused Gold Coins. The fact that players are making these repeated purchases when they have ample Gold Coins confirm that these transactions are driven entirely by the desire to obtain Sweepstakes Coins for real-money gambling, rather than for the Gold Coins that Defendant sells.

69.     Users may acquire Sweepstakes Coins through various means, including promotional giveaways, participation in contests or daily missions, and most commonly, through the purchase of Gold Coins. The more Gold Coins a user buys, the more Sweepstakes Coins they receive as an alleged "bonus." In reality, Defendant uses the sale of Gold Coins as a vehicle for the sale of Sweepstakes Coins, misleadingly marketing the transaction to obscure the real-money nature of the exchange. Here is an example of Defendant's in-game "store":

70.    Once obtained, users gamble with Sweepstakes Coins in the same manner as they do with Gold Coins. However, because Sweepstakes Coins are redeemable for real-world value, users who wager Sweepstakes Coins are engaging in gambling: staking something of value on an event determined predominantly by chance with the expectation of winning additional value in the form of redeemable prizes.

71.    Further, Defendant imposes a "1x playthrough" requirement on bonus Sweepstakes Coins, mandating that players must wager an amount equal to the number of bonus Sweepstakes Coins they wish to withdraw before any redemption is permitted. For example, to withdraw 25 Sweepstakes Coins, a player must first wager at least 25 Sweepstakes Coins on casino-style games offered through the SpinBlitz platform. This restrictive condition significantly impairs users' ability to redeem winnings and effectively forces continued gambling activity. The playthrough requirement operates as a coercive mechanism, compelling users to risk further losses under the

guise of accessing previously earned rewards. This practice is misleading, particularly when users are initially lured to the platform by representations that it is merely a "social casino" offering free-to-play entertainment. In reality, the platform's design systematically incentivizes and prolongs gambling behavior while obscuring the difficulty of actually obtaining monetary rewards— underscoring the predatory nature of Defendant's operations.

72.     In New York, it is illegal to operate and offer online gambling casinos, including, like here, websites that offer slot machines, jackpots, and poker. *See* N.Y. Const. art. I, § 9; N.Y. Gen. Oblig. L. § 5-401. In this regard, New York has a fundamental and deep-rooted public policy against gambling.

73.     Despite New York's clear prohibition on online gambling, Defendant operates unlicensed and illegal online casinos within New York, as discussed further below.

74.     Users of SpinBlitz stake or risk something of value when playing the games of chance offered on Defendant's platform. Specifically, players use Gold Coins or Sweepstakes Coins to participate in various casino-style games, the outcomes of which are determined predominantly by chance rather than skill. When using Sweepstakes Coins, players risk these digital tokens in hopes of winning additional Sweepstakes Coins, which may then be redeemed for cash or other real-world prizes. If the player wins, they retain or increase the number of coins wagered; if they lose, the coins are forfeited. This dynamic is materially distinct from traditional video games, where in-game currency is expended as a fee to play, irrespective of win or loss. In contrast, SpinBlitz mirrors the fundamental mechanics of real-money gambling, in which players risk a valuable consideration for the opportunity to win additional value.

75.     Under New York law, a game of chance is considered any "contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of

chance, notwithstanding that skill of the contestants may also be a factor therein." N.Y. Penal Law § 225.00(1); *see also White v. Cuomo*, 38 N.Y.3d 209, 228, 192 N.E.3d 300 (2022) (holding that the Constitutional prohibition on gambling reaches "the staking of value on a game in which the element of chance predominates over the element of skill[.]").

76.    While some user interaction is involved, the outcomes of SpinBlitz's games are overwhelmingly determined by chance. Games such as digital slots, roulette, and lottery-style spins rely on random number generators or similar chance-based algorithms. Upon information and belief, the results of these games are not influenced by any player skill or decision-making but are driven entirely by software that introduces randomness. As such, the element of chance predominates in determining game outcomes.

77.    The absence of skill components further emphasizes SpinBlitz's reliance on chance. Games commonly recognized as gambling, such as blackjack, craps, and interactive slot machines, incorporate some player decisions or interactivity. Therefore, the limited degree of user interaction does not remove SpinBlitz's games from the definition of a "game of chance" or "contest of chance" under New York law. SpinBlitz closely resembles so-called "I-Slots" (interactive slot machines), which allow limited user choice but are still fundamentally games of chance.[17]

78.    Even players with significant experience or familiarity with casino-style games can lose repeatedly if the game's randomizing mechanism is not favorable. Conversely, novice or

---

[17] BetMGM, *Slots and the World of Narrative Gaming*, https://casino.betmgm.com/en/blog/islots-narrative-gaming/ (last accessed November 3, 2025); SDLC Corp., *How Slot Games Are Incorporating Interactive Features and Mini-Games*; https://sdlccorp.com/post/how-slot-games-are-incorporating-interactive-features-and-mini-games/ (last visited November 3, 2025); https://lcb.org/articles/i-slots (last accessed November 3, 2025); Casino Life, *The Different Types of Online Slots & Their Features*; https://www.casinolifemagazine.com/blog/different-types-online-slots-theirfeatures#:~:text=I%2DSlots%2C%20or%20interactive%20slots,outcome%20through%20choices%20and%20gameplay (last accessed November 3, 2025).

inexperienced users may win if the randomized outcome happens to align in their favor. This inherent unpredictability underscores that the dominant factor in the outcome of each game is chance—not skill, strategy, or experience.

79.     Gold Coins and Sweepstakes Coins constitute things of value under New York law, because they provide an "extension of a service, entertainment or a privilege of playing a game or scheme without charge" and are considered "any representative of value" to players.

80.     The casino-style games on SpinBlitz closely mimic the experience of traditional gambling establishments. These games feature audiovisual elements—including slot machine graphics, sounds, animations, and game mechanics—that replicate the look and feel of real-world casino games, further blurring the line between entertainment and gambling.

81.     In sum, Defendant's SpinBlitz casino platform hosts casino-style games that are unmistakably games of chance. By offering these games of chance, Defendant is operating an unregulated online casino in violation of New York law, which explicitly prohibits gambling on games of chance conducted over the internet. N.Y. Gen. Obtig. L. § 5-401; N.Y. Penal Law § 225.00(1).

## IV.    *The Dual Currency System*

82.     Defendant attempts to circumvent this prohibition of online gambling—and similar in other states—by branding their casino games as free to play, so-called "sweepstakes" games. The core of Defendants' "sweepstakes" casino model is a dual currency system deliberately designed to obscure the fact users are engaging in real-money gambling. Players on SpinBlitz are introduced to two types of virtual currency: Gold Coins which purportedly hold no monetary value and are marketed as being solely for entertainment purposes, and Sweepstake Coins, which can be redeemed for real money at an exchange rate to the U.S. Dollar and serve as the gateway to

Defendant's illegal gambling operations.



83.    Gold Coins are presented as the primary currency for casual gameplay. Players can earn a limited number of Gold Coins through daily logins or promotions and then must purchase more Gold Coins to keep playing. Defendants emphasize that Gold Coins are non-redeemable in an effort to support their claim that their games are "free-to-play." However, Defendant bundles these purchases with Sweepstakes Coins, which can be used to wager on the same casino-style games as Gold Coins.

84.    When a player runs out of Gold Coins, they are prompted to purchase more in a bundled package with Sweepstakes Coins. Defendants characterize these transactions as primarily Gold Coin purchases with Sweepstakes Coins supposedly included as a "free" bonus. However, the pricing structure makes it clear that players are actually paying for Sweepstakes Coins.





85.     Upon information and belief, players can make purchases using Visa, Mastercard, and Discover.



86.     Defendant's dual currency structure transforms what appears to be innocuous gaming platforms into an unregulated online casino where players use real money to gamble on games of chance. Courts throughout the country have found that when players spend money to

obtain more "entries" or "bonus currency" despite already possessing unused amounts of the purported product (here, Gold Coins), there is unmistakable evidence that the "sweepstakes" or "promotion" is merely a front for gambling.

### V.    *Defendant Resurrects Internet Sweepstakes Café Model from Early 2000s*

87.    In the early 2000s, a widespread trend emerged in which unscrupulous operators attempted to circumvent state gambling laws by establishing so-called "Internet cafés." These businesses—often set up in suburban strip malls—purported to sell innocuous products such as internet access or long-distance calling minutes. In reality, the purchase of those goods was merely a front for what amounted to casino-style gambling: customers received "free" sweepstakes entries with each purchase, which they could then use to play slot machine-style games on computer terminals, with the chance to win real cash prizes.

88.    Most state gambling statutes define gambling as involving three core elements: (1) consideration**,** (2) chance**,** and (3) a prize. Operators of these Internet cafés attempted to sidestep the "consideration" element by claiming that the sweepstakes entries were promotional add-ons to legitimate purchases, akin to promotional sweepstakes run by brands like large brands. But this separation was illusory; the primary and intended purpose of the transaction was to enable gambling.

89.    Courts and law enforcement agencies across the United States uniformly concluded that these so-called sweepstakes promotions were thinly veiled gambling operations, and moved to shut them down under applicable state gambling laws.

90.    SpinBlitz now attempts to revive this discredited model. Defendant will urge the Court to accept the fiction that its operations are not gambling, but rather legal "sweepstakes" entertainment. That argument is not new—it is the same tactic employed by illegal gambling

outfits in the early 2000s, which courts and regulators uniformly rejected.

91.     As detailed herein, Defendant employs a structurally identical business model: users ostensibly purchase "virtual coins" but receive "Sweepstakes Coins"—with real-world value—for use in casino-style games of chance. The inclusion of token "free" methods of entry and the marketing language around "sweepstakes" do not change the underlying legal reality. Courts have consistently found such models to be unlawful.

92.     Defendant's attempt to rebrand illegal online gambling as a sweepstakes promotion is part of a familiar pattern already discredited by courts, regulators, and the public. SpinBlitz's operations are not novel—they are a modern replica of a failed and unlawful model.

## VI.     *Defendant Offers Gambling Without Statutory Consumer Protections*

93.     The harm caused by SpinBlitz' illegal gambling operation is further exacerbated by its lack of accountability and regulatory oversight. Unlike licensed casinos, which must comply with strict requirements to ensure fairness, transparency, and consumer protections, Defendant operates without these safeguards. The absence of oversight leaves players vulnerable to unfair practices, such as manipulated game outcomes, misleading promotions, and nonexistent or inadequate mechanisms to address problem gambling.

94.     Defendant's online casino actively undermines critical consumer protections required by New York law. For example, Defendant allows anybody over the age of 18 to gamble on its casino platforms in complete disregard for the laws prohibiting individuals under the age of 21 to gamble in New York. *See, e.g.*, N.Y. RAC. PARI- MUT. WAG. & BREED. LAW § 1332(1) ("No person under the age at which a person is authorized to purchase and consume alcoholic beverages shall enter, or wager in, a licensed gaming facility"); N.Y. COMP. CODES R. & REGS. TIT. 9, § 5313.2(b) ("A gaming facility licensee shall post signs that include a statement that is similar to

the following: 'It is unlawful for any individual under 21 years of age to enter or remain in any area where gaming is conducted. It is unlawful for any individual under 21 years of age to wager, play or attempt to play a slot machine or table game. Individuals violating this prohibition will be removed and may be subject to arrest and criminal prosecution.' Such signs shall be posted prominently at each entrance and exit of the gaming floor."); § 5313.2(c) ("A gaming facility licensee shall identify and remove any person who is under 21 years of age and not otherwise authorized by law to be on the gaming floor and immediately notify onsite commission staff when a person under 21 years of age is discovered on the gaming floor, in areas off the gaming floor where gaming activity is conducted or engaging in gaming-related activities."); § 5329.19(a) ("No person under 21 years of age may place a wager with a casino sports wagering licensee").

95.    Upon information and belief, Defendant also disregards the consumer protection laws that require casinos to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the New York's Voluntary Self-Exclusion Program. *See, e.g.*, N.Y. COMP. CODES R. & REGS. TIT. 9 § 5325.2(a) (requiring each gaming facility licensee to "submit for commission review and approval a problem gambling plan"); § 5325.4(a) (requiring each gaming facility licensee to "submit to the commission quarterly updates and an annual summary of its problem gambling plan and goals"); § 5325.5 (requiring each gaming facility licensee to "post signs in a size as approved in writing by the commission that include the problem gambling assistance message" approved by the commission); § 5325.6(b) (requiring all advertisements to "contain a problem gambling assistance message comparable to one of the following: (1) If you or someone you know has a gambling problem, help is available. Call (877- 8-HOPENY) or text HOPENY (467369); (2) Gambling Problem? Call (877-8-HOPENY) or text HOPENY (467369); or (3) any other message approved in writing by the

commission."); § 5325.6(c)(4)(i) ("for websites, including social media sites and mobile phone applications, the problem gambling assistance message must be posted on each webpage or profile page and on any gaming-related advertisement posted on the webpage or profile page"); § 5327.1(b) ("Each gaming facility licensee shall exclude from its premises any person who such gaming facility licensee knows meets the exclusion criteria"); § 5327.3 ("The placement of a person on the excluded persons list shall have the effect of requiring the exclusion or ejection of the excluded person from all New York State licensed gaming facilities."); § 5329.34 ("Each casino sports wagering licensee and sports pool vendor licensee shall comply with the problem gaming, self-exclusion and excluded person requirements.")

## VII.    *Defendant Deceptively Markets SpinBlitz as a "Free-to-Play Social Casino" to Lure Consumers and Obscure the True Nature of Its Illegal Gambling Operations*

96.    Defendant markets its online platform as a "social" casino to lure consumers to wager on games of chance under the guise of "free" play and harmless entertainment.

97.    For example, SpinBlitz prominently describes itself as "the leading free spins casino" and misleadingly states that there is "no purchase necessary" to play its games. It boasts a vast array of offerings, inviting consumers to play a plethora of different games of chance. SpinBlitz's website messaging is designed to entice players with promises like, "At SpinBlitz.com it is ALWAYS FREE to enter or win our Sweepstakes games. No Purchase Necessary," "Start spinning immediately on online slots from top providers for free," and "There's nothing easier that getting GC at SpinBlitz free spins casino." As shown below, Defendant's website leverages advertisements designed to captivate users with promises of "free" play on its "social casino" platform.









98.     These carefully crafted messages and branding strategies are designed and intended to obscure the true nature of SpinBlitz as unlicensed online casino where players wager real money through a deceptive system of "free" gameplay and misleading rewards. SpinBlitz markets itself as a "free-to-play social casino," while at the same time encouraging consumers to engage in what amounts to real-money gambling.

## FACTS SPECIFIC TO PLAINTIFF

***Plaintiff Roberts's Experience***

99.     In response to Defendant's online advertising and representations described above, and under the belief that she was playing harmless and "free" social gaming, Plaintiff Roberts played SpinBlitz from approximately 2023 to June 2025 during which she made many in-game purchases of Gold Coins and Sweepstakes Coins.

100.     Plaintiff Roberts accessed SpinBlitz from her residence in New York. Plaintiff Roberts received an initial allotment of Gold Coins and Sweepstakes Coins. After losing her initial allocation of free Gold Coins and Sweepstakes Coins, Plaintiff Roberts began purchasing Gold Coins and Sweepstakes Coins from Defendant and did so from New York, which Defendant accepted.

101.     Plaintiff Roberts placed all or substantially all of her wagers in SpinBlitz in New York.

102.     Overall, Plaintiff Roberts wagered and lost thousands of dollars in real-world currency while using SpinBlitz and its games of chance. She lost the Sweepstakes Coins and Gold Coins she purchased from Defendant by wagering them in SpinBlitz's games of chance.

103.     By and through SpinBlitz's gambling features described above during the time period of approximately 2023 to June 2025, Roberts was induced into making these purchases that she otherwise would not have made.

104.     As a result of Defendant's unfair, unlawful, and deceptive acts, Defendant was unjustly enriched.

## CLASS ALLEGATIONS

105.     Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)

on behalf of herself and all others similarly situated defined as follows:

106.    The Class is defined as follows:

**New York Class**: All New York residents who, during the applicable limitations period, have lost money wagering on Defendant's online casino games.

107.    Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

108.    **Numerosity.** Upon information and belief, there are hundreds, if not thousands, of Class members, so joinder of all members is impracticable. The precise number of class members and their identifies are unknown to Plaintiff currently but may be ascertained from Defendant's books and records and other third-party sources.

109.    **Commonality.** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

a.    Whether the games in SpinBlitz are gambling as defined under New York law.

b.    Whether Defendant engaged in the conduct alleged in the Complaint.

c.    Whether Defendant violates the statutes listed below in Counts I, II, and III.

d.    Whether Defendant violated statutes analogous to those alleged herein applicable.

e.    Whether and how Defendant manipulates the odds in games offered in SpinBlitz;

f.  Whether Plaintiff and the other Class members were damaged by Defendant's conduct; and

g.  Whether Plaintiff and the other Class members are entitled to  restitution or other relief.

110.  **Typicality**. Plaintiff's claims are typical of the claims of the Class because they were players of SpinBlitz who made in-game purchases of coins and wagered such coins as a result of Defendant's unlawful and wrongful conduct. The factual and legal basis of Defendant's liability to Plaintiff and to the other Class members are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the other members of the Class have suffered harm and damages due to Defendant's unlawful and wrongful conduct.

111.  **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class.  Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions.  Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other members of the Class.

112.  **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication. The damages or other financial detriment suffered by Plaintiff and putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be

impracticable for members of the proposed Class to individually seek redress for Defendant's wrongful conduct.

113.    **Final Declaratory or Injunctive Relief.** Defendant has acted and failed to act on grounds generally applicable to the Plaintiff and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

**FIRST CAUSE OF ACTION**
**Violation of the New York Loss Recovery Act**
**N.Y. Gen. Oblig. L. § 5-419**
***(On Behalf of Plaintiff and the New York Class)***

114.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–113 by reference as if fully set forth herein.

115.    Plaintiff brings this count individually and on behalf of the New York Class under New York General Obligation Law § 5-419, which was enacted to effectuate the State's public policy against unlawful gambling.

116.    All forms of unlicensed gambling, including wagers, bets, or stakes—based on games of chance are unlawful in New York. N.Y. Gen. Oblig. L. § 5-401.

117.    Section 5-419 of the Loss Recovery Statute provides: "Any person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not." N.Y. Gen. Oblig. L. § 5-419.

118.    Accordingly, this provision of the Loss Recovery Statute prohibits a person or entity from profiting from gambling activity—whether or not they are the actual "winner" of the wager

or bet—and permits the person who paid or lost the money to recover it from the recipient.

119.    Defendant's casino games solicit "wager[s] or bet[s] prohibited" because they invite users to play games of chance (e.g., online slot machines) for money or other things of value (Sweepstakes Coins), which constitutes illegal gambling under both New York civil and penal law. *See* N.Y. Gen. Oblig. L. § 5-401 ("All wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."); N.Y. Penal Law § 225.00 (defining "gambling" as the "stak[ing] or risk[ing] something of value upon the outcome of a contest of chance" and defining "gambling device," as "any device, machine, paraphernalia or equipment which is used or usable in the playing phases of any gambling activity, whether such activity consists of gambling between persons or gambling by a person involving the playing of a machine."); N.Y. Penal Law §§ 225.05225.10 (making advancing and profiting from unlawful gambling a misdemeanor or felony).

120.    Defendant's Sweepstakes Coins constitutes money or a thing of value because its value is directly tied to the U.S. Dollar ratio. Just like casino chips in a brick-and-mortar casino, Sweepstakes Coins serves as a proxy for real currency, allowing players to wager, win, and ultimately cash out their balances in a form that retains actual monetary value.

121.    Defendant's online casino platform is an Internet site that permits consumers to play games of chance (e.g., online slot machines) for money or other things of value (Sweepstakes Coins).

122.    Every casino game offered on Defendant's online platform is a "gambling device" because they accept money or other valuable items (Sweepstakes Coins) from players, operate on chance using random number generators, and enable players to stake, hazard, and bet money or

other valuable items (Sweepstakes Coins) with the potential to win or lose money or other valuable items (Sweepstakes Coins).

123.    Defendant's games of chance relevant here do not permit players to gamble directly against other players. Rather, like the "house" in a traditional brick-and-mortar casino, Defendant is the "winner" under the statute because it has a direct stake in the result of the gambling. When players wager Sweepstakes Coins on games of chance and win, they can redeem their winnings for real prizes in U.S. Dollars—meaning Defendant incurs the equivalent monetary loss. Conversely, when players bet Sweepstakes Coins on games of chance and lose, Defendant retains the full value of the lost Sweepstakes Coins, just as traditional casinos profit from losing bets placed against the house.

124.    Defendant is also a "stakeholder" under this provision of the Loss Recovery Statute because, on information and belief, the money wagered by Plaintiff and the New York Class on Defendant's Chance Games was delivered or deposited into accounts owned or controlled by it.

125.    By purchasing, wagering, and losing Sweepstakes Coins on Defendant's casino platform, Plaintiff and each member of the New York Class gambled and lost money or things of value.

126.    Defendant owns, operates, and controls the gambling games described herein, and directly profited from Plaintiff's and the New York Class members' gambling losses. Defendant is therefore the "winner" under N.Y. Gen. Oblig. Law § 5-419 of all moneys lost by Plaintiff and the New York Class members.

127.    Defendant operates an illegal gambling website that is accessible in New York.

128.    Plaintiff's and the New York Class members' losses occurred in New York because Defendant's online casino games were played by New York residents on computers, mobile

phones, and mobile devices in the State of New York. Defendant had actual knowledge that Plaintiff and the New York Loss Class members reside in New York because each of them selected "New York" as their state of residence and provided their complete home address pursuant to Defendant's mandatory registration process.

129.    Plaintiff, on behalf of herself and the New York Class members, seeks an order requiring Defendant to (1) cease the operation of its gambling business, and (2) return all lost monies, with costs, pursuant to N.Y. Gen. Oblig. Law § 5-419.

## SECOND CAUSE OF ACTION
### Violation of New York General Business Law § 349 (Deceptive Acts and Practices)
#### *(On behalf of Plaintiff and the New York Class)*

130.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–113 by reference as if fully set forth herein.

131.    New York General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in the State of New York. N.Y. Gen. Bus. Law § 349(a).

132.    N.Y. Gen. Bus. Law § 349 applies to Defendant's actions and conduct as described herein because it is a broad consumer protection statute that prohibits recurring deceptive acts or practices in business transactions, including those involving the marketing and sale of goods or services to New York consumers.

133.    Plaintiff and the members of the New York Class are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

134.    Defendant engaged in consumer-oriented conduct by marketing SpinBlitz as a "free" "social casino," while concealing the fact that its platform constitutes unlawful gambling with real financial risks.

135.    Indeed, Defendant markets its website as a "Free-to-play social casino" and repeatedly represents that "[a]t SpinBlitz.com it is ALWAYS FREE to enter or win our Sweepstakes games. No Purchase Necessary," "Start spinning immediately on online slots from top providers for free," and "There's nothing easier that getting GC at SpinBlitz free spins casino." These representations are materially misleading because consumers are induced to spend real money to obtain in-game currency required to continue playing or to participate in Defendant's games of chance that award redeemable real money prizes. In truth, Defendant's platform is not "free," as meaningful participation and extended play depend on the monetary purchase of Sweepstakes Coins, and the advertised "free" coins are insufficient to engage in the promoted gameplay or sweepstakes.

136.    Further, Defendant represents to consumers, including Plaintiff, that "**THIS WEBSITE AND THE SERVICES PROVIDED HEREIN DO NOT OFFER "REAL MONEY GAMBLING. NO ACTUAL MONEY IS REQUIRED TO PLAY, AND THE SERVICE IS INTENDED FOR ENTERTAINMENT PURPOSES ONLY.**" (emphasis in original). Defendant misleads consumers into believing they are not engaging in real money gambling by wagering Sweepstakes Coins on the casino games offers on its platform. Plaintiff relied on these representations in playing SpinBlitz.

137.    Defendant further misleads consumers by bundling Gold Coins with Sweepstakes Coins that have redeemable value, thereby disguising the true nature of its unlawful gambling business model.

138.    Defendant's practices described herein, including the operation of an illegal casino and the sale of Sweepstakes Coins, are deceptive under N.Y. Gen. Bus. Law § 349 because they contravene New York's public policy against unlawful and unregulated gambling, and caused

substantial injury to the consumers who purchased Sweepstakes Coins.

139.    A reasonable consumer would be misled to believe that Defendant's platform offers genuinely free entertainment without financial risk, when, in fact, the design of the site and its representations are intended to lure consumers into paying money to gamble on its games of chance, all while Defendant purports to be a "social casino" for "entertainment purposes only."

140.    Defendant caused substantial injury to Plaintiff and the New York Class by inducing them to purchase and wager Sweepstakes Coins through the design of its illegal gambling platform. The injury caused by Defendant's conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided.

141.    Defendant's unfair practices occurred during the marketing and sale of Sweepstakes Coins for use on SpinBlitz's illegal gambling platform, and thus, occurred in the course of trade and commerce.

142.    Further, Defendant represents to consumers, including Plaintiff, that its games are not gambling and you can "play for free." Defendant's website also states that it is "the leading free spins casino," "does not offer real money gambling," and is for "entertainment purposes only" to deceive consumers into believing that they are not engaging in gambling by wagering Sweepstakes Coins on the Chance Games offered on its platform. Defendant repeatedly represents that "[a]t SpinBlitz.com it is ALWAYS FREE to enter or win our Sweepstakes games. No Purchase Necessary," "Start spinning immediately on online slots from top providers for free," and "There's nothing easier that getting GC at SpinBlitz free spins casino."

143.    Further, Defendant conceals from consumers, including Plaintiff and the New York Class, that wagering with Sweepstakes Coins on its platform constitutes illegal gambling

prohibited by state law.

144.    To make matters worse, upon information and belief, Defendant disregards the consumer protection laws that require casinos to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the New York's Voluntary Self-Exclusion Program. *See, e.g.*, N.Y. Comp. Codes R. & Regs. Tit. 9, § 5325.2(a) (requiring each gaming facility licensee to "submit for commission review and approval a problem gambling plan"); § 5325.4(a) (requiring each gaming facility licensee to "submit to the commission quarterly updates and an annual summary of its problem gambling plan and goals"); § 5325.5 (requiring each gaming facility licensee to "post signs in a size as approved in writing by the commission that include the problem gambling assistance message" approved by the commission); § 5325.6(b) (requiring all advertisements to "contain a problem gambling assistance message comparable to one of the following: (1) If you or someone you know has a gambling problem, help is available. Call (8778-HOPENY) or text HOPENY (467369); (2) Gambling Problem? Call (877-8-HOPENY) or text HOPENY (467369); or (3) any other message approved in writing by the commission"); § 5325.6(c)(4)(i) ("for websites, including social media sites and mobile phone applications, the problem gambling assistance message must be posted on each webpage or profile page and on any gaming-related advertisement posted on the webpage or profile page"); § 5327.2 ("Each gaming facility licensee shall exclude from its premises any person who such gaming facility licensee knows meets the exclusion criteria"); § 5327.3 ("The placement of a person on the excluded persons list shall have the effect of requiring the exclusion or ejection of the excluded person from all New York State licensed gaming facilities"); § 5329.34 ("Each casino sports wagering licensee and sports pool vendor licensee shall comply with the problem gaming, self-exclusion and excluded person requirements").

145.    Defendant aggressively marketed and advertised its platform through various media while at the same time concealing that it is illegal under state law. As such, New York consumers, including Plaintiff and the New York Class, are highly likely to continue to encounter current and future iterations of Defendant's illegal platform absent injunctive relief.

146.    Further, Defendant's conduct is deceptive because it is designed to encourage illegal gambling while marketing its platform as a legal simulation of casino-style games, as well as to exploit psychological triggers associated with gambling and addiction in order to target susceptible populations.

147.    These deceptive practices are material and likely to mislead reasonable consumers, who are led to believe they are participating in harmless social gaming rather than unlawful, unregulated gambling.

148.    As a direct and proximate result of Defendant's violations of N.Y. Gen. Bus. Law § 349, Plaintiff and the New York Class members have suffered actual injury in the form of loss monies paid to purchase Defendant's coin packages and monies lost wagering Defendant's Sweepstakes Coins.

149.    Plaintiff, on behalf of herself and the New York Class members, seeks an order requiring Defendant to (1) cease the deceptive practices described herein, (2) return all monies acquired through any purchase that included the transfer of Sweepstakes Coins to Plaintiff and the New York Class, and otherwise (3) pay damages, interest, and reasonable attorneys' fees, together with costs and expenses.

**THIRD CAUSE OF ACTION**
**Violation of New York General Business Law § 350 (False Advertising)**
*(On behalf of Plaintiff and the New York Class)*

150.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–113 by

reference as if fully set forth herein.

151.    N.Y. Gen. Bus. Law § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect." N.Y. Gen. Bus. Law § 350-a(1).

152.    Defendant engaged in false advertising by marketing and promoting SpinBlitz as a "free" or "social casino" offering harmless entertainment, when in fact Defendant operates an unlawful online gambling platform that allows players to wager and redeem digital currency for money and prizes.

153.    Defendant disseminates advertisements and marketing materials throughout New York falsely represent its platform as a "free-to-play social casino" that is "ALWAYS FREE" and that "No Purchase [is] Necessary" to play their games.

154.    Defendant's homepage and digital advertisements repeatedly emphasize "FREE" gameplay in its "free spins casino," while omitting material facts that users must purchase in-game currency to meaningfully participate or access the games of chance.

155.    These representations are objectively false and misleading because Defendant's so-called "free" play is illusory: users receive only minimal non-purchasable credits and continue play or meaningful participation requires real-money purchases of Sweepstakes Coins.

156.    Defendant further misrepresents SpinBlitz as a "free-to-play social casino" that is "intended for entertainment purposes only," rather than unlicensed online casino. Indeed, Defendant represents to consumers, including Plaintiff and the New York Class, that its platform "DOES NOT OFFER 'REAL-MONEY GAMBLING.'" By doing so, Defendant creates the false impression that its platform is lawful and that consumers are merely engaging in risk-free social

gaming rather than illegal gambling.

157.    Defendant's advertisements fail to disclose that the SpinBlitz platform operates in violation of New York law, that consumers are engaging in real-money gambling, and that Sweepstakes Coins constitute things of value that can be lost while playing Defendant's Chance Games. These omissions are material because they would influence a reasonable consumer's decision to engage with and make purchases on Defendant's platform.

158.    The above-referenced advertising and marketing statements are likely to misled a reasonable consumer acting reasonably under the circumstances into believing that SpinBlitz offers "free," "social," or "entertainment" play rather than unlawful gambling with real financial risks.

159.    Defendant's representation "No Purchase Necessary" is objectively false and misleading because, in practice, consumers incur costs and must make purchases of Sweepstakes Coins to meaningfully participate in Defendant's games of chance. The limited free coins provided upon sign-up are quickly exhausted and insufficient to engage in the advertised gameplay. As a result, players are effectively required to buy additional virtual currency to continue playing and to engage in games with redeemable prizes. By conditioning continued gameplay on the purchase of virtual currency, Defendant's platform renders its "ALWAYS FREE" and "No Purchase Necessary" representations materially false and deceptive. The "No Purchase Necessary" language thus operates as a deceptive disclaimer masking what is, in substances, a pay-to-play gambling enterprise.

160.    Defendant's false advertising was directed at the public at large and occurred in the course of Defendant's business practices within New York.

161.    Defendant aggressively markets its illegal casino platform through targeted

advertisements on social media, digital marketing campaigns, and other promotional efforts aimed at attracting New York consumers. These advertisements emphasize free-to-play gaming, large potential winnings, and enticing promotions while concealing the true nature of Defendant's gambling operation.

162.    Defendant's false and misleading advertising deceived Plaintiff and New York Class members, leading them to engage with and make purchases on SpinBlitz under the mistaken belief that they were not participating in illegal gambling.

163.    As a direct and proximate result of Defendant's false advertising, Plaintiff and the New York Class have suffered actual damages in the form of monies paid and lost for Defendant's Sweepstakes Coins.

164.    Plaintiff, on behalf of herself and the New York Class members, seeks an order requiring Defendant to (1) cease the deceptive practices described herein, (2) return all monies acquired through any purchase that included the transfer of Sweepstakes Coins to Plaintiff and the New York Class, and otherwise (3) pay damages, interest, and reasonable attorneys' fees, together with costs and expenses.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
***(On behalf of Plaintiff and the New York Class)***

165.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–113 by reference as if fully set forth herein.

166.    Plaintiff and the New York Class members have conferred a benefit upon Defendant in the form of the money they paid for the purchase of Sweepstakes Coins to wager on Defendant's illegal casino platform.

167.    Defendant appreciates and has knowledge of the benefits conferred upon it by

Plaintiff and the New York Class.

168.    Under principles of equity and good conscience, Defendant should not be permitted to retain the money obtained from Plaintiff and the New York Class members, which Defendant has unjustly obtained as a result of its unlawful operation of casino games. As it stands, Defendant has retained millions of dollars in profits generated from its unlawful games of chance and should not be permitted to retain those ill-gotten profits.

169.    Accordingly, Plaintiff and the New York Class members seek full disgorgement of all money Defendant has retained as a result of the wrongful conduct alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of all others similarly situated, the following relief:

1.    For an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, defining the Class as requested herein, appointing Plaintiff as class representative and her counsel as class counsel.

2.    Awarding Plaintiff all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and to be determined by proof.

3.    Awarding Plaintiff and the class members appropriate relief, including actual and statutory damages.

4.    Awarding Plaintiff's reasonable attorneys' fees, costs, and other litigation expenses.

5.    Awarding pre- and post-judgment interest, as allowable by law.

6.    For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein.

7.    Declaratory and equitable relief, including restitution and disgorgement.

8.      For public injunctive and declaratory relief as the Court may deem proper; and

9.      Awarding such further and other relief as the Court deems just, proper and equitable.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.


Dated: December 3, 2025                    Respectfully submitted,


By: */s/ Randi Kassan*
Randi Kassan
New York State Bar No. 4375754
**MILBERG PLLC**
100 Garden City Plaza, Suite 408
Garden City, NY 11530
Tel: (866) 252-0878
rkassan@milberg.com

By: */s/ Andrew Shamis*
Andrew Shamis, Esq.
New York Bar No. 5195185
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave., Suite 705
Miami, FL 33132
Telephone: 305-479-2299
ashamis@shamisgentile.com


*Counsel for Plaintiff and the Proposed Class*